We'll hear argument next in number 2011-1538, ACTIVEVIDEO v. Verizon Communications. I'd like to begin this morning by talking about non-infringement, and the overarching point here is that in the face of obvious new market demand for interactive service, AVN tried to define a patentable path to a very crowded prior art. So they wrote three critically narrowing claim terms that properly construed, conclusively exclude the excused systems and methods. First, all four AVN patents require that the claimed information services must be supplied from the network, from the head end or the node, we use various terms for that, from there to the subscriber's set-top box. That is, undisputed that all claim terms so recite. It's also undisputed that the accused FIOS system, when it provides video on demand or any other information service, does not create the interface for subscriber interaction up at the head end in the network. So you say it's not disputed, but it is disputed, because FIOS, the head end provides the content. The STB provides the template, the head end provides the content. The jury was within its province to decide that both of those are part of the information services, that without the content, you don't have an interactive thing, you don't have the information service. So it's a question of facts with the jury, and that evidence is not... The content is critical, but the content, you cannot interact with the content, with the raw data, without the interface. You can't interact with the template, absent the content. So it was within the jury's province to decide they were both relevant, and part of it is provided by the head end. Not if you accept that the entire information service has to be sent down from the network. See, this system was built at a time... Where does it say the entire information service? Well, in every patent claim, it says that the information service is delivered from the head end to the set-top box. So if you believe that the interface for subscriber interaction is part of the information service, then that too must be provided from the head end, as it was in the specifications for each of these patents. What the patents show, when you look at the figures and the specifications, they show that content and the interface are combined into a single, ordinary television signal that you could tune to as you would tune to NBC or CBS. Everything comes down from the head end, so that you can have a completely dumb set-top box. That was the whole point of this invention. You needed no intelligence. All you needed was a demodulator. At the figure 7, figure 8, the patents showed it. But don't we have a situation in which, at least even under your claim, construction of information service, that some of the interface capability was coming from the head end? I looked at Mr. Schoenfeld's testimony, and he talks about the Facebook widget. My understanding from that testimony, and tell me if I'm wrong, is that the Facebook widget came from the head end, and that that would satisfy this claim limitation, even under your interpretation of information service. Why am I wrong about that? Well, two answers on that. First, the main claims were against the video-on-demand system, and there, it's undisputed that the interface is generated at the set-top box by Verizon. Even in the Facebook context, there's rich functionality that resides in the set-top box, and that will not work with the kind of dumb set-top box that ABM... And I think it's at 38.15.17. It seems to testify that the Facebook widget involves an interface, which it does, right? And that that is provided from the head end. Well, if you look more carefully at Schoenfeld's testimony, what he actually says, I mean, he does say that it's provided from the network, but then he goes on and acknowledges that what he's talking about is the data, the metadata, the underlying information that is then formatted by the set-top box to present to the user. Suppose we disagree with your interpretation of the testimony. Suppose that, in fact, he did testify that the Facebook widget came from the head end. Would that indicate that there was... the information service limitation was satisfied? If the jury accepted his testimony that the entire interface came from the head end, then the Facebook widget... We would not have this argument with respect to the Facebook widget. We would still have it with respect to video on demand, which is the whole basis for the damages award. And in any event, if I might, the court in our JMAL motion never resolved the fundamental issue of whether the interface has to be sent from the head end or whether it can be generated at the set-top box. We specifically in our JMAL said it's generated at the set-top box and therefore we're entitled to judgment. You've got like 50 issues here. You mind if I move you along? Absolutely. Because five minutes of your time is gone already. Absolutely. So why don't you talk about the 578 and the television information signal and the television communication issue. Okay. With the 578, we're talking about three locations here. We're talking about the content vault where the movies and information services are kept. We're talking about the head end and then we're talking about the subscriber's premises. The relevant terms of the 578 has to do with the communication between the content vault and the head end. The disk drive and the processors. Exactly. And the claim limitation says that that has to be in television communication, the head end and the vault. It is undisputed that under the FIOS system, we use a proprietary signal format, CCP and RAID 2nd. You use either CCP or RAID 2, but the underlying content signal, I take it, is MPEG, MPEG-2. The storage, the content is stored in MPEG, but this court has made a clear distinction in a number of cases, in the DDL and other cases, which we cite at page 12 of our brief, between content and signal. In other words, the content is contained within an envelope, but the signal cannot be understood by a television. The television would not know what to do if it received that. Here's your problem. The patent expressly, this is basically straight lexicography here because the district court, as you all agreed, adopted word for word what's in the specification and the specification says television information signal is any signal that may be utilized by a television for video display, regardless of form, including an MPEG compressed digital data stream. Well, a TV, especially in 1994, when these patents were first written, can't read a compressed MPEG digital data stream, only after the top box decompresses it and then feeds it on a wire. Exactly. It demodulates it. Right. But much more is involved with the file system. But isn't that, again, for a jury to decide? Because you've already admitted by vis-a-vis claim construction that the signal doesn't have to be something. What's sent from the disk drive to the processor doesn't have to be something that's immediately, without additional processing, readable by a TV. The set-top box may have to do something to convert it, demodulate it, or otherwise modify it before it can be read. So once you accept that, why isn't the jury free to decide whatever needs to be done to the RAID and CCP signal? Is there really any difference in demodulating a compressed MPEG? Because in the file system, it's not an MPEG signal. And there is a distinction between MPEG content and an MPEG signal. An MPEG signal, all you have to do is demodulate it and the dump set-top boxes set forth in the patent work. But that's a question of fact for a jury, whether there's a difference between demodulating a compressed signal and otherwise doing something along the lines of what's done in CCP and RAID changes. No, it's a claim construction issue for the court. As I noted in the Digio case, this court drew a sharp distinction between an MPEG signal and MPEG storage. And once you accept the district court's claim construction that the signal has to be utilized by a television, the CCP and RAID squared signals cannot be utilized by a television. If I encrypt an MPEG signal and then I send that downstream, is that no longer an MPEG signal in your view, as the term is used? You know, in that case, I think it might still be an MPEG signal, but it could not be interpreted by the television without the encryption. Right, but that would be enough to be an MPEG signal, i.e. television communications, right? It could not be utilized by a television without... I think Judge Moore's question suggested that television communication, as defined in the patent, seems to contemplate something other than things that are purely readable by a television, especially in 1994. Right, but it does not contemplate the sort of proprietary signals between the content vault and the head end in the file system. The whole point of the ADN patents was to have a streamlined system where they could plug and play, and they weren't going to interfere with the signal that was going from the content vault all the way down to the user. The file system is very different because the content vault and the head end do not communicate using MPEG signals. Now, if I may, I'll move on to the other non-infringement argument. Before you address the one-to-one processor, let me ask you, suppose I agree with you on any of your other infringement arguments, does the damage award stand? And the reason I ask is because I went back and looked at all the testimony, and your expert's testimony and their expert's testimony was for the technology. So if one of these patents is... Nobody distinguished it. Not your expert or theirs on a, well, this much should be apportioned to these patents versus this one. So if any of the patents that you were found to infringe are affirmed, doesn't the damage award, 115 million, stand? Well, no. A couple of the patents have already expired. In fact, they expired during trial. And those patents could not be a basis for continuing damages. No, but that's the sunset royalty. That's not the 115 million, which is for past infringement. So what about that? No, that's the... Well, when we get to our marking argument and our... You've got three minutes left. Okay, well, how about if I move on to adjunction and marking, and I will answer that question. Suppose you lose on marking. 115 million, I mean, if any of the infringement stands, doesn't the 115 million stand? It's just an academic matter of whether you infringe all or less than all, but the damage award isn't changed or affected. Unless you accept our... Well, no. It's not true. The judge said, with respect to our marking argument, the only past damages he allowed were for the one patent that was a method patent. 670. Yes. And those were the only past damages. So there were no past damages awarded on the other three patents. And the district court properly barred the damages on three of the four patents, the one that allowed pure apparatus and the one that allowed mixed. You're saying the whole 115 million is only attributable to the 678? All the damages up to the time of filing suit are attributable only to the 678. And which of the claim limitations that we're talking about are in the 678? Only the first one I raised about the information. Only information service. The television communications and the one-to-one are not in that district court. Correct. So you need to win on information service in order to have an effect. Or on the communication in 678 also. Is it not in the claims for which you're asserting maybe in the 678? The television communication certainly appears in the 678. Is it in the claims? I just don't know if it's not in the ones you're asserting. It's not the same argument, Your Honor. We only raised that argument with regard to 582. So if I can quickly make a point about why markings should have applied to the method patent here under this court's decision in Devices for Medicine v. Bohl in which the court had three types of patents. The court had ones that were apparatus. The court had ones that were mixed. And the court had ones that were just method. And the method patents involved the use of the apparatus in the other patents. And the court held that those were barred under the marking doctrine. And the same result should apply here. Particularly after the Supreme Court's recent decision in Quanta in which it stressed that the artificial distinction between apparatus and method claims should not bar application ordinarily of the estoppel doctrine. But so far in terms of this marking rule, we've only looked and said things need to be marked when the apparatus and method claims are contained in the same patent. And I'm a little nervous because the rule you're proposing is that no, if there are other patents that claim the apparatus and then these patents claim the method, they should still have to mark even in order to get damages under the method patent, which they normally wouldn't need to. I guess what concerns me about it is now we've got to look not within the same patent, but across different patents if we're going to do what you want us to do. And for example, Avianne argues that, wait a minute, no, not all the same limitations. The method is not identical to the apparatus. Now, maybe it is in this case, maybe it isn't. But my concern is you're asking me to create a broad rule of law that's going to be an absolute mess in implementation for everybody because not always will it be clear that the apparatus corresponds to the method patent. First of all, the rule of law was already established in Devices for Medicine. Second, in this context... No, the rule of law wasn't established in the context of the individual patent. You're asking us to look across patents. A single patent, of course, the disclosure applies to both. No, in full, there were three patents. There were three assertive patents. One with only apparatus claims, one mixed, and one with only method claims. And the court held that marking applied to all three. Yeah, but it didn't consider the argument we're talking about here now. It didn't address the argument we're talking about here now. As I understand your argument, you're saying that if the different patents originated from a single parent, they were continuation applications, then you have to mark the device with a number of the method patent as well. You're not saying that this would be true with respect to patents that had a different origin, that went back to a different parent, correct? Well, these do have the same parent. No, no, I understand. But you're not arguing that if they went back to a different parent, that the marking requirement would apply to a method patent? If the same apparatus was involved in the other patents. In other words, if the method is the use of an apparatus. You're not limiting it to patents that have a single parent? I don't think Devices for Medicine v. Bolt limited it to patents that have a single parent. I don't think the Supreme Court's Quonset decision I properly read would so limit it. In any event, we do go back to the same patent. There's no doubt all their evidence concerned the apparatus that was dealt with in the other patents, and that they claimed that we practiced the method of using that apparatus. So this should be a very simple case in terms of marking. The court's indulgence in helping to address the injunction issue. Why don't we briefly do that? We'll give you a little extra time and then give your opposing counsel a little extra time. But try to keep yourself to a couple of minutes if you would. Thank you. The injunction kicks in in two weeks. We argue that it was an abuse of discretion for essentially two reasons. Have you all designed a round already? Am I allowed to know that or not? We have done a design around. We're planning to implement it. The other side has already indicated that they plan to challenge that. So we're hoping that this court will resolve that issue by throwing out the injunction, which was an abuse of discretion. Probably not in the next two weeks. So I would guess that... No, but the court could potentially enter a stay of the injunction. All right, go ahead. First of all, any non-speculative harm, and here we're talking about the loss of revenues from Cablevision, ADM's only significant customer, is demonstrably compensable by royalties. And the second point, all that's left once Cablevision royalties are covered, is pure speculation that cannot support an injunction. And the most telling fact here, the most telling fact in admission that ADM is not suffering irreparable harm, is that they asked the court, District Court, to double the time of the sunset royalty. They were willing to let it go a year. They wanted it to go a year. So let me deal with the Cablevision lost revenues first. The arm's length deal between Cablevision and ADM sets an absolute ceiling on potential harm to ADM from indirect, purely monetary losses of Cablevision licensing fees. Because all they have to do is require that we pay a royalty on all of our customers, not all of whom would have gone to Cablevision anyway, even if we did not have the technology. Now the second thing the District Court relied on was lost potential revenue from possible future customers. And that rests on two, and only two, pieces of evidence. First, their expert said, well, hypothetically, they may agree to offer exclusivity on certain products. Didn't say licensing, just said on certain products. And their CEO said, well, they might be able to get a better deal from Comcast if Verizon was not a licensee. Now that sort of speculation is not sufficient to support an injunction. And it's also contradicted by all the evidence in the case. Their own evidence at trial that they repeatedly offered to license their products on a non-exclusive basis. They wanted Verizon as a client. They testified, we want to sell guns to both sides in this war. And their CEO, their lead investor, said they were always willing to license for the right price. So in that context, where they were actively seeking Verizon as a customer, where they are not a direct competitor, where any indirect harm can be fully compensated, where they delayed five years before they even brought this suit because they were pursuing us as a customer, it's an abuse of discretion to have granted an injunction. Thank you. We've run through your rebuttal time, but we'll give you a couple of minutes of rebuttal in light of the numerous questions that you were asked. Mr. Peterson. Good morning. May it please the Court. We've extended your time. I noticed that. Thank you very much, Your Honor. Could you begin with the injunction? Because it does seem to me that the evidence that you submitted with respect to irreparable harm is somewhat thin. I mean, you can't rely on irreparable harm to cable vision. You have to show irreparable harm to active video. That's true. Correct. And I'm having difficulty in seeing why you wouldn't be compensated for any lost revenue from cable vision by the continuing damages award with respect to any Verizon activity. Well, Your Honor, let's keep in mind, I'd like to speak to that because the point is that the fact that... Let me just give you a frame of reference. I think it'll make it easier. The evidence in this case is that the way competition is achieved in this industry, and the District Court found this, is based upon the acceptance of your system. And the more your system becomes accepted, the more people use it, the more you are able to market it to others. And what Mr. Kellogg isn't focusing on with respect to the irreparable injury equation at all is, is the material in addition to cable vision. And I'll come back to why that supports us as well. But he's not focusing on the findings the District Court made about negative impact on the brand, negative impact about acceptance in the market, nor is he focusing on the fact that the District Judge recognized that it has an impact in our competitive relationships with others who we don't yet have or at least didn't have a relationship till labor, like Comcast, where the evidence is that had an impact on our ability to price with them. So these are the kind of... So the idea is that by having cable vision use your system and cable vision having a lot of customers and being able to market it to other people, you might have greater revenues than you would get if Verizon were allowed to continue to... That's exactly right, Your Honor. And then let's just go back to the... And from other people. You're arguing you're kind of like Tebow. You're kind of like Tebow, right? Is that sort of your argument? Like you got a great product and you want people to use your product because you'll earn a lot more money that way. But instead of a big, big company like Verizon comes along and can just use your technology in their own products and no one's going to license from you and you're going to end up becoming an NCE by the end of the day. That's your argument. That's it. And let's remember how this dispute started. I mean, you know, there's... You don't want to be a manufacturer. You don't want to be an NCE. Verizon sued Cablevision, our customer, over their patents. And so we responded with this suit out of necessity. And what we want to do is gain acceptance in the marketplace. Now, I just come back to finishing my answer to Judge Dyke's question. Even as to Cablevision, I mean, the fact that someone is going to continue to use the technology until they make some effort to engineer around it pursuant to some royalty arrangement is not the kind of, you know, market penetration and acceptance. It's not like the world is holding out that this is an active video system they're using. It's their system which just happens to use our technology. So again, we're not achieving the benefit which the district court found is where the harm was, the irreparable harm. The retail customers don't know and don't care whether it's your system or somebody else's, right? But others in the industry do. But the wholesale customers, the Cablevisions of the world care is what you're saying. That is right. And that is also why we don't need to have this direct competition as this court has said last year in the MITEI case. So which of the affidavits addresses this point that you're arguing? I think the key affidavit to look at is the Miller affidavit. And then in addition, you'll find the district judge making findings on these subjects in the appendix based on the Miller affidavit. The Miller affidavit, I think, is the one that talks most about it. But the district judge's findings on these subjects are at pages 11, 12, and 15, and 16, I think. Why aren't your arguments now about this irreparable harm, which is a more tenuous irreparable harm than the typical irreparable harm? They're taking sales directly away from us, direct competitor type harm. So your irreparable harm claim may be legitimate, but it's certainly more tenuous than the normal one in these sorts of cases. So why isn't that offset by the notion that you negotiated actively for five years to secure Verizon as a licensee, you continuously offered them a license, and then you all yourself voluntarily offered to extend the Sunset royalty period for a year. Why isn't all of that pretty darn strong evidence that money is enough to compensate in this case? No, Your Honor. We were just... The one-year matter was just an issue that was taken up with the district judge with respect to a frame of reference. Remember... They asked for six months. You offered a year. No, no, take twice as long. No, because the point was we wanted to make sure that they had an opportunity to do their... It was a condition the judge raised. That's only altruistic of you, and not something I normally see in litigation. It was a matter... Nonetheless, you offered it, so money was enough in that six months, along with, of course, the good feelings you would get from letting them design around. But remember that what we were talking about in that context was the monetary condition that would be associated with an injunction the district judge said he was going to impose. This was essentially the price of staying the enforcement of an injunction. So I think it's a different kind of framework from the point of view of counsel. It's not just about money, right? You just said that the reason you're willing to do this is because you got more money. 60-40 split, high profit margin because you took the one right off your expert. So you were willing to extend it because it was delaying the injunction. Well, that just means it's all about the price. It's not a matter of are you willing to do it? It's a matter of how much will you take? No, we sought the injunction, and the district judge was inclined to give it, and he said, all right, we'll talk about what condition I'm going to place on it on an interim basis, but we sought the injunction without any limitation or restriction. That's how this question comes up. And I think ultimately it's up to the district judge to do the balance of equities here with respect to the issuance of an injunction and to make a determination. And again, we have this classic group of irreparable injuries that has not been addressed, things I was speaking about a moment ago with respect to the brand acceptance. And we've also got the difficulty in the cable vision context of understanding what would have happened in this marketplace, findings the court also made, if there hadn't been an injunction. How many major players are there in this industry? In the... We know, I mean, Verizon, cable... Oh, in the cable industry? Yeah. There are actually many companies throughout the United States. I'm not sure I can give you a count of what I'd call the major players, but for example, you know, this is... That would be ultimately customers for Activision. There's certainly cable visions. There's Comcast, where we're at work on building a relationship. There's also an array of smaller customers. One of the things you've heard is this hasn't been deployed before. It has been in Hong Kong and in Minnesota and elsewhere. Well, if it's in Hong Kong, it's not a problem. But that's right. But the point of that is that that's relevant to the whole point, which is, yes, we did some licensing, but the licensing was never to allow anyone to make the product. The licensing was in order for people to use the product, deploy the product, and therefore would be in a position to let us build our brand and gain wider acceptance of it. And the testimony is that the way you do it is by convincing people that consumers want it and use it. So perhaps I should... Unless the court wants to point me in... This is a hydra-headed monster. I appreciate the issues. If you'd like to point me elsewhere. Let's try information service. Information service. Suppose they're right about the claim construction. And let's suppose also that they are wrong about the Facebook widget, and that does come from the head end. But they say that doesn't involve video on demand. Therefore, even if you're right that under their claim construction there's still evidence of infringement, it couldn't justify the damages award that exists here, right? Yes, that's their argument. Okay, let's start. This is not an important point. This is not a claim construction issue. This was a... Well, go ahead. This was a stipulated construction based on words in the past. Yeah, but I know. And the problem is under Abbott, you're not supposed to introduce claim construction issues post-trial, but the trouble is that what's an infringement and what's a claim construction issue kind of shade into each other. And what we would say under Abbott is we're not going to do the claim construction post-trial, we take the ordinary meaning as the thing was presented to the jury, but let's suppose they're correct that the ordinary meaning goes their way rather than your way, and that the ordinary meaning is that the interface has to be with the service rather than with the subscriber, and that this evidence exists that even under that interpretation there's some infringement with respect to at least the Facebook widget, so how do you... You can come back later and argue that their construction's wrong. I'm just trying to ask you a hypothetical question. I understand. Let's assume their construction is correct, but that there is evidence that the Facebook widget at least infringes under that, so why are they not correct that the damages award can't be sustained based on that minimal amount of infringement? Because it's not just the Facebook widget that comes down from the head end, it's also, for example, all of the menus that you would use for purposes of selecting the television, the video on demand. So where do I find that? You're going to find that in the record, the program guides and menus, you're going to find it 52-12-15, 52-45-46, 95-80. You're also going to find testimony... Is that just the data that goes into the template that you're talking about? Isn't that what these reference? It's not when you say menus and program guides, you mean the content, but you don't mean the interactive template. But it's part of what makes the interactive template operate. But it's the data. It is the data, but that is the data. Let's assume that the data doesn't count. I'm trying just to get an answer to my hypothetical. The data doesn't count, their claim construction is right, but there's evidence that the Facebook widget at least infringes. So what do we do about the damage? Well, the damage... I guess I'm resisting you, Your Honor, because the testimony on this substantial evidence question includes a lot more than just the Facebook widget that would constitute the required interface. But again, I don't think it would impact the damage award if you thought that was a defect because the damage award is not differentiated and would extend to each of the relevant patents because they were regarded as blocking patents. And so I don't think it would have an impact. Why wouldn't it affect the reasonable royalty negotiation if only there was a small amount of infringement? Wouldn't that affect how much someone would be willing to pay in a reasonable royalty? Well, I suppose in a theoretical case it might. I'm not sure that it would have that impact here because the way the royalty was calculated was by determining that the key premise of the expert testimony was that this interactivity was crucial to the ability of Verizon to be successful with its cable television system, and what we'd be speaking about with the Facebook widget is a component of that, and that's the basis by which the profits were calculated. I guess your argument is they didn't try to unpack the damages and make that argument fall out, right? That's right. But let me also, if I may, go back because I really think that we need to focus on this interface requirement. Again, I don't think we redo claim construction when we have a defined term in the patent, but more importantly, if you look at what the term says, the service and the interface are different things. The interface is simply the ability to interact with the service. There's nothing that says that the service has to be generated from a particular place. It speaks of the fact that, quote, any service capable of being furnished to a television viewer having an interface permitting, but not requiring interaction with the facility of the cable provider. The problem is that you can't say it does not include the video on-demand menus or even the set-top box. It's the ability to interact with the system, and it would be a bad interaction if all you had was some formatting or de-scrambling in a set-top box, which didn't then allow you to decide what television program you were going to look at, and I think the best evidence of this is the testimony from their expert, Schmant, which is at 4764 of the appendix. I didn't see any interface being sent from a remote server in the patent either, and he then proceeded to testify that the different interface is you can choose a different movie, and to their suggestion that he was somehow crediting our view of the case, he said he was discussing the interface in terms of how it is described in the patents. So again, we're talking, I think, about a substantial evidence question as to which there was ample evidence from our experts and from theirs which justifies the verdict that the jury would turn. I do move on to the 582 patent and the one-to-one processors because I don't see the FIOS processors being assignable on a one-to-one basis. They look to me to be all shared and all the testimony to support that. I don't understand the impringement on that one. Yes. Again, let me start by pointing out we're dealing with an unobjected-to claim construction, and the thing to keep in mind if you look at that is to think about assignment as selection of the processor that will be providing the service. That is a reasonable interpretation of it. Again, we're not here on claim construction, and the evidence that was induced is of two types. No, but the claim construction is processors that are capable of being assigned on a one-to-one basis to a home interface controller. That's right. I don't see how the FIOS processors are ever assigned on a one-to-one basis. Well, they are at times. Other than when you flip the switch on for the first time. There is testimony that... Yeah, for a microsecond. But again, I think what we're doing is we're falling into the trap of thinking that assignment means dedicated or exclusive use. That is not necessarily the interpretation... No, it's not what I'm going to do. That's what one-to-one means. Yes, but... You may be assigned to argue before me, but you're not assigned on a one-to-one basis to argue before me. But the point is it's the relevant selection, I think, that is a permissible basis for the experts to express their opinions that this was meant. And let me explain why the patent itself justifies that interpretation. The patent itself differentiates between private line assignment which would be the exclusive dedicated assignment that I think the court is exploring with me in its questions, versus a party line assignment, which I think, Judge Moore, is what you perceived as perhaps often being the case except in this initial assignment scenario. So the patent itself recognizes the possibility that there can be these different scenarios. Thus, I think, again, if Verizon wanted to make this a claim construction issue... These different scenarios that would be within the individually assigned... That's right. In other words, individual assignment does not preclude the scenario of multiple assignments to a single processor because that's what the patent contemplated. That's not one-to-one, and the construction includes one-to-one basis. That's not... Multiple coming into one thing is not one-to-one. But the experts testified that it can be... It is one-to-one as each user is entering in to use the system to be assigned to one of the relevant processors, and it can result in this period of dedicated use. So, again, with the concept of dedicated, I think, being different from selected. Suppose we reject your claim construction here, your argument is infringement, and we agree that there was an infringement. This doesn't, if I understand correctly, Mr. Kellogg agrees that doesn't affect the past damages. What does it affect? It certainly affects the injunction, but does it have an impact on the damages during the sunset period? No. No, I don't think it does because, remember, the injunction is predicated on two different patents. First, this only applies to the 582. The injunction by its terms applies... I understand. ...to the 578 patent, so it wouldn't have any effect on the injunctive part of the 578 patent. Well, I understand, but what about the impact on the sunset royalty? No. Your Honor, I don't think it would because, again, the testimony was that going back to this system, that the benefit that Verizon got out of it was because it reduced its loss of customers, it got new customers because it had this interactivity. So what the district judge did as a trier of fact in the post injunction process is he simply decided what then is a reasonable amount to stay... In setting the sunset royalty, did he rely on the fact that there was infringement of all of these patents as opposed to just one of them? He didn't specifically differentiate, I don't think. He just took... He did the same thing that was done with respect to the damages, which is that the damages were not themselves differentiated and neither did their expert purport to draw differentiation. And so he just proceeded on the same basis and, again, we've got blocking patents and we've got testimony that the entire interactivity here was the key to what made this an attractive opportunity for Verizon to improve its financial performance and enhance its profitability. I know your time is almost up. I want to ask you about the 748 patent. Yes. Assuming that I don't agree that Verizon waived its argument on the 748 patent about the translation and the first interactive and the second interactive, turning to directly then to the issue of anticipation, which is a question of fact, and what a prior art discloses, which is also a question of fact, why was summary judgment appropriate on that patent? I don't see anything in the 689, which is the anticipatory reference, that discloses a second interactive element, which is at the heart of their translation issue. You've got to translate it from one interactive element to the second interactive element. And I don't see anything in the 689 patent that discloses that second interactive element. Let's see. Even if parsing amounts to the translation and transformation somehow, I don't see the second interactive element. Your Honor, the key point here is that the patent itself speaks of the... I guess I don't want the key point. Okay, I'm sorry. Show me in the 689 patent where the second interactive element is disclosed, because I don't see one, and the anticipation requires that. And it may well be there, but whether it's there is a question of fact. It's not apparent from the reference itself. You had no expert testimony on this issue, right? I think that's true, Your Honor. Correct. That's the big problem. You asked us to sit down and read the patent, or to ask the district court to read the patent, and how do we know what it is? So I think what I would point you to, Your Honor, is the reference which we talk about in our brief, which is in the patent at 689.6.9-13, and it says a received HTML document is provided by a communications manager to hotmail parser 51, which then converts the parser page description to a displayable format. So I think that's the key point that demonstrates the relevant transformation that we've seen. It's not a transformation, but where does it describe the second interactive element? Excuse me. I think I... Okay. Pardon me. No problem. So I think the key point is to look at the relevant information about these selectables, which you will find at figure 6 in the patent, and at 689.3-26-27. Wait, 26-27, what is that? That's in the patent. Column 3. Yeah. Column 3. So hotmail parser 51 also generates a listed display of displayables. I'm sorry, forgive me. Column 3, line what? Lines 32... I'm sorry. It's column 6, lines 32-44. What page are you at? What page? 15-132 of the JA. Yeah. 15-132. Column 6, lines what? Lines 32-44. Well, a displayable is not an interactive element, is it? In addition, the hotmail parser generates a sorted list of selectables, like objects that you can select from, that is hypertext anchors. So that would be our view of the demonstration of the second element. Well, no. I think this is a legitimate interpretation of this. You think it is, but what a reference discloses is a question of fact, and I don't read it that way. I personally read it as not a second interactive element, just a table of things that can be clicked on, not actually making  But again, I mean, I'm not record evidence, certainly. But it's a table of things that If you didn't present any, then it's a question of fact. Well, this would be what I would urge the board to focus on. Just very briefly, we're making you work overtime anyway, but television communication, what in your view is the limitation  communication that would be sufficient to distinguish it from the rest of the world? Data communication. I think here the key aspect of television communication that's relevant with respect to this TV signal infringement issue is the presence of MPEG as well as the testimony that it is in a stream as well as the testimony which   different when the television is in a stream, when the television is When it's sent via their proprietary signaling system, there's specific testimony from the expert that that is not a relevant distinction. As long as embedded in the signal that is sent, no matter how deeply and no matter how elaborate  that are needed to decode the signal, as long as embedded in the signal is a signal that would be understandable to a television, that is a television communication. Is that your theory? Well, the experts testified that this qualified as a relevant signal, the way it was embedded within the specific proprietary system that is claimed by Verizon as being a sufficient to meet the definition and thus it doesn't have to be readable so long as it's sendable. I mean, another example... Would my just for purposes of helping me understand what you're saying, would my characterization of the definition that you're implicitly applying be accurate? Perhaps I wasn't... Well, I mean, I guess I'm not trying to... Your Honor, however deeply embedded, I mean, I'm not sure how far you want to take the hypothetical. It is not to be readable by the television. It can be transformed as it is here by the set-top box, but if it is conveying this television signal subject to this requirement of transformation, that was enough evidence under this non-disputed claim construction. Okay. Okay, then we will hear from the whole... Thank you, Your Honor. I'll be brief. I want to address Judge Teich's hypothetical first about the 582 patent. First point I want to make is that the Facebook widget only applies to the 582 patent. The allegation was that the Facebook widget only infringes the 582 patent, so if the 582 is knocked out for the reasons discussed, because there are no individually assignable processors, then that issue disappears. I would note that all the damages testimony was about video-on-demand, about how video-on-demand decreases customer turnover, increases customer ads. All of that was based on video-on-demand, not the Facebook widget. Now, with respect to the 582, that is not a party-line patent. Some of the other patents talk about party-lines. The 582 does not, and indeed they expressly distinguish the prior art, the Blauwood patent, on precisely the grounds that we don't infringe either because the processors are not individually assignable. Multiple people can get on each of those processors. He tried to suggest that one of our experts said otherwise. He was quoting from our invalidity expert, Mr. Schmanth, who testified that under ADN's view, the patent was enough, but he was not our non-infringement expert on that. If we knock out the 582, we knock out the widgets, and then we have the pure issue for the other remaining three patents of the lack of provision of information services from the head-end to the set-top box if you accept our view that the interface has to be included, which their own experts accept. Their infringement expert, Dr. Schoenfeld, conceded that, quote, it's the service that has to have the interface. That's A3908. So, too, did their source-code expert Frederickson Cross. The whole point of that at the time was they wanted a device that you just simply use your remote to choose things, and you're communicating at all times with the head-end, not with the sophisticated set-top box. The testimony of their own inventor was, you know, back at that time, it would have cost a fortune to put this kind of functionality in the set-top box and would have taken up half the room. Everything's gotten much cheaper. Processing power is faster. That's why Verizon can put all this in the set-top box so that it does not infringe these patents. Unless the court has further questions. I do. How many of these patents are still extant, and when do they expire? Two of them have expired. The only two that are extant are the 582, which has six years remaining, and the 578, which has 15 months remaining. And of course, if the court accepts our argument that there's no television communication between the content fault and the head-end, because I'm sorry? That affects the 582, right? That affects the 578. The 578, which is 15 minutes to go, 15 months to go. It is a very narrow patent. And if the court accepts our injunction issue becomes moot. Both of those patents. So if we accept your argument on the 582, then the injunction on the 578 is only the 15-month injunction. That's correct. There would be only 15 months, and it's a much narrower patent. Wouldn't that go into the irreparable harm? I mean, if it's only 15 months to keep you off the market, wouldn't that harm Verizon more? Exactly. It would go directly to irreparable harm, because even if they speculate we might want to give an exclusive arrangement, a cable company is not going to pay extra money to get an exclusive arrangement on a patent that's going to expire in 15 months. Okay. Thank you. Mr. Kellogg and Mr. Peterson. The case is submitted.